

FILED
FIRST JUDICIAL
DISTRICT COURT
2021 JUN 15 AM 10: 26

**FIRST JUDICIAL DISTRICT COURT**
**COUNTY OF SANTA FE**
**STATE OF NEW MEXICO**

Case No.: D-101-~~DM~~-CV-2021-01335

<u>Vanessa Lucero</u>
**Petitioner/Plaintiff,**

**BRYAN BIEDSCHEID**

vs.

<u>State of New Mexico (NM), Human Services Department (HSD)</u>
**Respondent/Defendant.**

**COMPLAINT** ~~and JURY TRIAL DEMAND~~ of Employment and Various Law Violations  VL 6/15/21

Plaintiff: Vanessa Lucero
11108 Buffalo River Road, Southeast
Albuquerque, New Mexico 87123
vmalucero@gmail.com
(505) 489-8270

Defendant: State of New Mexico
Human Services Department
1474 Rodeo Road
Santa Fe, New Mexico 87505
Physical employment location:
Office of Inspector General
8909 Adams Street, Suite A, Northeast
Albuquerque, New Mexico 87113-2724

I, Vanessa Lucero/Plaintiff, am suing the State of New Mexico (NM), Human Services Department (HSD) for $7.2 million dollars based on HSD's severe violations of laws, unlawful employment practice of discrimination, harassment, retaliation, violation of the Title VII Civil Rights Act including disability rights/ Americans with Disabilities Act (ADA) by failing to provide reasonable accommodation despite no undue hardship and despite thorough documentation from Plaintiff's medical provider. This Complaint is in the best interest of the general public as HSD violated Plaintiff's Title VII Civil Rights, human rights, employment rights, and subjected Plaintiff to unbearable anguish, pain, and suffering. While working for

1 | Page

**EXHIBIT A**

HSD, Plaintiff experienced mistreatment, HSD violated the Equal Pay Act of 1963 (equal pay for equal work) and violated fair labor standards. Plaintiff was harassed by Defendant/Defendant's management authorities with libel and defamation of character. HSD issued bias reprimands to Plaintiff. Plaintiff was denied training that all other employees received. Plaintiff was isolated from their entire work unit, suffered retaliation punishment by taking away Plaintiff's approved Alternative Work Schedule (AWS) and revoking fitness leave. HSD denied Plaintiff several well-deserved promotions, but HSD promoted people with less degrees/education than Plaintiff and promoted individuals who were hired years after Plaintiff was hired with HSD. HSD was negligent regarding Whistleblower complaint Plaintiff filed with Office of Human Resources (OHR) and Office of Secretary (OOS) in or around February 2020 regarding the waste of government resources and unjust employment practices occurring within the Office of Inspector General (OIG). Plaintiff was subjected to inhumane and disgusting circumstances for months in which fecal matter covered the only toilet available for use (additional employer negligence). Plaintiff was subjected to unfair discipline practices and suffered extreme consequences. Two employees in HSD's Office of Inspector General (OIG) who bullied Plaintiff where not punished like Plaintiff, but instead, HSD/OIG requested OHR provide a pay increase for one of the bullies (pay increase for bully requested in March 2020). Plaintiff was forced to complete tasks that workers in Plaintiff's pay band (pay band 60) don't do (unfair assignments) and that Plaintiff was never hired to perform. HSD continued to alter Plaintiff's job duties to enforce their will via Employee Evaluations (EE) definitions. Due to a medical diagnosis, Plaintiff is good with numbers and HSD took advantage of the symptoms by forcing Plaintiff to calculate overpayment claims. Calculating overpayment claims is not an essential function of the management analyst position. Plaintiff identified over half a million dollars for the State of NM, meanwhile the other management analyst(s) washed vehicles at the carwash and got car oil changes; unequal job duties. Plaintiff's skill of numbers was taken advantage of and HSD changed/altered Plaintiff's job duties immediately after Plaintiff started working at HSD/OIG. Plaintiff experienced additional personal injury for lack of safe workplace due to Defendant's negligence and failure to intervene with action. Plaintiff seeks jury trial with omitted wages compensatory, punitive damages of the maximum limitations established by the Civil Rights Act of 1991, Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981, HSD Code of Conduct: Standard of Service/Courtesy 041.4.1C, Professionalism 041.4.2A, Safety in the Workplace

041.5.8, Abuse of Office 041.7.1B, and all other applicable laws. Plaintiff reserves the right to present witnesses regarding this legal action.

1. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 111, 451, 1331, 1343. This action is authorized and instituted pursuant to Sections 703(a), 704(a), 706(f)(1), 706(f)(3), of Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), 2000e-5(f)(1), 2000e-5(f)(3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981., 29 U.S.C. §§ Chapters 6, 7, 8, 28 and 32. HSD violated their own Code of Conduct (COC) in the areas of: Standard of Service/Courtesy 041.4.1C, Professionalism 041.4.2A, Safety in the Workplace 041.5.8, Abuse of Office 041.7.1B, and all other applicable laws and statutes.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the First Judicial District Court in the State of New Mexico. NM Human Services Department's main office is located in Santa Fe, NM.

3. This matter pertains to enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and 706(f)(3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1), (2) and (3), and all other applicable laws.

4. More than thirty days prior to the institution of this lawsuit, Vanessa Lucero ("Lucero"), a former employee of Defendant, filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging violations of Title VII by Defendant.

5. On or about June 22, 2020, Vanessa Lucero filed EEOC Charge No. 543-2020-00447 against State of New Mexico, Human Services Department, alleging discrimination based on disabilities and retaliation.

6. On March 18, 2021, Ms. Lucero received EEOC's Notice of Right to Sue.

7. Since at least October, 2019, Defendant has engaged in unlawful retaliatory practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-(2) by removing employment privileges, and ultimately, constructive discharge of the employment of Ms. Lucero because she opposed discriminatory practices and participated in an EEOC proceeding.

8. The effect of the events described above has been to deprive Ms. Lucero of equal employment opportunities in retaliation for exercising her federally protected rights.

9. The unlawful employment practices described in this Complaint were intentional.

10. The unlawful employment practices described in this Complaint were done with malice or with reckless indifference to the federally protected rights of Ms. Lucero.
11. The effect of the events described above has been to deprive Ms. Lucero of equal employment opportunities in retaliation for exercising her federally protected rights.
12. On October 29, 2011 – Plaintiff began employment with HSD under the Income Support Division (ISD). At ISD, Plaintiff grew to become an expert in benefit eligibility determination. Plaintiff worked for HSD/ISD until September 2018.
13. On September 22, 2018 – Plaintiff began employment with HSD under the Office of Inspector General (OIG) in a management analyst position.
14. March 2016 through November 2020 – Plaintiff was on intermittent Family Medical Leave Act (FMLA) due to disabilities until constructive discharge.
15. Since 2011, Plaintiff was only promoted once in HSD (promoted 2014) and was never promoted again while being on intermittent FMLA.
16. HSD/OIG has internally promoted multiple employees, but never promoted Plaintiff.
17. While working for HSD/OIG, Plaintiff was the only employee denied training that other individuals received. Individuals in Plaintiff's direct office and same pay band where sent to South Carolina for a weeklong training at least once every 6 months. Whereas, Plaintiff was never allowed this training opportunity.
18. HSD never sent Plaintiff to South Carolina for training, but HSD sent all other employees.
19. When Plaintiff started working for OIG, on or around September/October 2018 – Inspector General/Director, Adrian Gallegos, and Bureau Chief, Ken Romero, asked Plaintiff if Plaintiff could calculate overpayment claims on cases regarding fraud and determine overpayment amounts for restitution collection based on benefit eligibility. The basis of this was because HSD/OIG had large numbers of cases needing monetary claims calculated and they were waiting for ISD to do the claims, but ISD would not do the claims. Plaintiff being new to OIG, wanting to prove self and exhibit skills and out of the goodness of eager heart agreed to help.
20. HSD placed assisting with claims as a duty inside Plaintiff's opening Employee Evaluation (EE) in October 2018. This was in addition to the position I was hired for – Management Analyst Operational, Investigations Bureau, to review fraud referral

allegations and determine if it merits an investigation, closure, or appropriate course of action on case by case basis; and to handle all matters related to the Administrative Hearing Decision (ADH) process.

21. Plaintiff being new to OIG, wanting to prove self and exhibit skills and out of the goodness of eager heart agreed to help. However, Plaintiff did not think about their own mental health and fluctuates of such:

   a. Plaintiff did not think about their mental state when agreed to calculate claims.
   b. Plaintiff did not consider mental issues, flareups, and did not think about disability episodes.
   c. Performing this specific task of overpayment claims calculations has been severely detrimental to the symptoms of Plaintiff's disabilities, thus, exacerbated Plaintiff's condition; triggered anxiety and stress increases all Plaintiff disability symptoms.
   d. Plaintiff poured time, effort, and attention to recover claims worth thousands upon thousands of dollars for HSD, but yet, Plaintiff did not receive any benefit for the additional labor whatsoever.
   e. Never was Plaintiff informed that Plaintiff would not be able to stop doing overpayment claims if it became too much
   f. Plaintiff was never told that Plaintiff wouldn't be able to stop doing claims calculations if it became too overwhelming.
   g. Plaintiff was never told that calculating claims would become a permanent requirement of working at HSD/OIG.
   h. During the first year of claims calculations Plaintiff was never informed that if the task became too much to handle, Plaintiff would receive reprimand, threats and tarnished in permanent personnel file.

22. On October 22, 2019, Plaintiff got the courage to inform Director Adrian Gallegos ("Gallegos") that Plaintiff would like to stop doing overpayment claims and asked what the consequences would be.

23. 10/22/2019; Mr. Gallegos immediately verbally threatened Plaintiff that Plaintiff must calculate claims as ordered by OIG or it would be insubordination. Plaintiff was immediately subjected to discipline with threats from Mr. Gallegos that if overpayment

claims were not performed Plaintiff would be written up at Office of Human Resources (OHR) and labeled as insubordinate.

24. Plaintiff offered to train the other staff members in calculations so everyone could know how to perform claims, but Mr. Gallegos did not want that.

25. Plaintiff is the only pay band 60 position at OIG required to complete overpayment claims.

26. Plaintiff created a spreadsheet for case synopsis that make claims calculations clearer for other employees, but Mr. Gallegos did not want other workers calculating overpayment claims.

27. A couple of other employees in the OIG know eligibility determination, but Plaintiff was the only one required to perform the additional duties.

28. Prior to Plaintiff working for OIG, the OIG never performed claims calculations.

29. It is in Plaintiff's opinion that identifying overpayment claims is not a "special project/assignment" and really should be a position on its own.

30. Plaintiff was never hired to calculate overpayment claims.

31. Calculating overpayment claims is a tedious task and stresses Plaintiff out to no end. Calculating overpayment claims on fraud cases caused Plaintiff extreme undue stress and anxiety.

32. On October 23, 2019 – Plaintiff was subjected to discipline by receiving verbal threats from the Bureau Chief (Ken Romero), another supervisor (Eric Marquez), and Plaintiff's supervisor (Jessica Gomez) stating that if Plaintiff did not perform claims calculations, Plaintiff would be written up to Office of Human Resources (OHR) as being insubordinate.

33. Plaintiff was again threatened with insubordination.

34. Plaintiff believes the bullet above is a form of non-financial extortion by obtaining eligibility determination via overpayment claims calculations through forcible threats of labeling me as insubordinate and reporting me to OHR.

35. In the meeting on October 23, 2019, Plaintiff brought up the fact that the other management analyst in Albuquerque office, Bridget Ortiz, does not perform claims calculations and management responded that Bridget does not know eligibility so she cannot do claims.

36. In the meeting on October 23, 2019, Plaintiff brought up the fact that Agent Chris Saavedra ("Saavedra") pay band 65 (above Plaintiff's pay band) knows eligibility determination as he used to be a trainer at ISD. OIG management stated Chris was working on other stuff that he volunteered for and could not do overpayment claims calculations.

37. No other individuals in Plaintiff's same pay band (pay band 60) at OIG performed overpayment calculations.

38. Plaintiff provided alternatives to the duty of calculating claims, but HSD/OIG/ Mr. Gallegos didn't want that. Although others in the office know how to calculate claims.

39. Plaintiff was not hired to do the task of calculating overpayment claims on cases. This is outside of Plaintiff's hired job duties, and without any additional compensation, and is a huge trigger for Plaintiff's medical disabilities and symptoms.

40. HSD neglected Plaintiff's mental state and disabilities, disregarding Plaintiff medical episodes. It is in Plaintiff's opinion that HSD staff did not attempt to understand why Plaintiff needed to stop doing claims, nor how much of a trigger it is to Plaintiff's symptoms.

41. On October 28, 2019 – HSD retaliated by changing Plaintiff's job duties in Employee Evaluation (EE) to force compliance while reducing the normal amount of time allotted to complete management analyst position (non-claims) assignments.

42. This is Discrimination based on Plaintiff disabilities and Retaliation regarding overpayment claims calculations:
    a. Retaliation for Plaintiff requesting a pay increase (pay increase requested April 8, 2019) for being forced to perform two jobs.
    b. Retaliation for Plaintiff saying they cannot do overpayment claims calculations anymore because it causes great undue stress (October 2019). Claims calculations raises Plaintiff's anxiety, and stress is a trigger for Plaintiff other conditions and symptoms.
    c. Retaliation for Plaintiff filing complaints.

43. On April 8th, 2019 – Plaintiff asked Director Adrian Gallegos for a pay increase for him having me do the overpayment claims calculations. Plaintiff never received a response nor acknowledgment from HSD regarding the pay increase request. Plaintiff believes this

is lack of Courtesy (violation of HSD's Code of Conduct) as Plaintiff did not receive any notification whatsoever, not even a no.

44. OIG does give 10 percent pay increase for some people up to and including March 2020 (State Personnel Office policy allows for this), but OIG did not request OHR provide a pay increase.

45. At or around April/May 2019, HSD decided that ISD would resume calculating overpayment claims on cases involving fraud. Due to conflict within HSD, ISD calculating their own overpayment claims did not last long (~6 months)

46. In or around October 2019, Agent Stacy Schell ("Schell") approached Plaintiff asking questions of how to complete the Restitution Form ISD143 for overpayment claims to be sent to Restitution Services Bureau. Plaintiff explained the form to Ms. Schell and Ms. Schell informed Plaintiff that Ms. Schell was going to start calculating the overpayment claims.

47. Around mid-October 2019, supervisor Jessica Gomez ("Gomez") and Mr. Gallegos informed Plaintiff they wanted Plaintiff to start performing overpayment claims calculations again.

48. Calculating claims was not the position Plaintiff applied for, not hired for, and had Plaintiff known this would be the circumstances, Plaintiff would not have taken a demotion from ISD to join OIG.

49. Calculating overpayment claims is extremely detrimental to Plaintiff's health. Calculating claims was extremely overwhelming for Plaintiff.

50. Plaintiff was never notified that if calculating claims was too much to handle, that Plaintiff would not be able to stop the duty. Plaintiff was not hired to do the task of calculating overpayment claims, this is outside of Plaintiff's hired job duties, and without any additional compensation, and is a huge trigger for Plaintiff medical disabilities.

51. On or about October 28th, 2019, HSD/OIG retaliated against Plaintiff (for opposing overpayment claims calculations) and OIG changed and altered Plaintiff's job duties by updating Plaintiff's Employee Evaluation (EE) to force compliance.

52. EE dated October 28, 2019, confirmed further retaliation and punishment by reducing the allotted amount of time Plaintiff has to complete normal management analyst duties and assignments.
53. Neither of the two individuals who held the Management Analyst position prior to Plaintiff were subjected to such treatment indicated in bullets above and below.
54. By reviewing EE's one can see how HSD/OIG manipulated Plaintiff's position duties and assignments. Instead of having Plaintiff having 14 days to screen incoming referrals to see if they have merit to be investigated, Plaintiff only had 7 days to screen incoming referrals – unless Plaintiff is performing overpayment claims calculations.
55. Supervisor Jessica Gomez had Plaintiff sign the EE on 10/28/2019.
56. The past two individuals who held Plaintiff current position as Management Analyst (Stacy Schell and Stacie Abeita) always had 14 days to screen referrals, but not Plaintiff anymore after October 2019.
57. The two management analysts who previously held Plaintiff's position never had to do overpayment claims. Both individuals who previously held the management analyst position before me were promoted in OIG, but not Plaintiff.
58. During October 2019 EE review, Ms. Gomez stated that another factor of Plaintiff's work time screening referrals being reduced from 14 days to 7 days unless claims are performed, is that Plaintiff was helping the other management analyst, Bridget Ortiz ("Ortiz"). Plaintiff got in trouble for helping Ms. Ortiz. Ms. Gomez did not like Plaintiff helping Bridget and Plaintiff was not allowed to help Bridget anymore without prior approval from Jessica. No other employees were treated this way.
59. Plaintiff suffered additional retaliation by HSD in the forms of altering Plaintiff's working conditions/terms and changing/removing Plaintiff's employment privileges.
60. In or around November 8, 2019 – Plaintiff was isolated in the office because Plaintiff's entire unit was moved to the office space next door, Suite B, but not Plaintiff.
61. None of Plaintiff's coworkers were subjected to such treatment indicated in the bullet above.
62. Plaintiff was not separated from work unit due to operational reasons.
63. Plaintiff was discriminated against because no other employees were treated this way. No one else in Plaintiff's unit was subjected to such treatment including isolation.

64. Plaintiff stayed in Suite A, in a nook-in-the-wall, while the rest of Plaintiff's employment unit was placed in newly remodeled Suite B with personal offices complete with closing doors.

65. The information in the bullet above is further discrimination and retaliation as HSD isolated Plaintiff.

66. HSD only leased five office rooms in Suite B. There are at least 10 (additional) available office spaces in Suite B that HSD could have leased, but Plaintiff was excluded.

67. On or around 12/18/2019, Ms. Gomez sent an email to our unit stating we are not to go to anyone else in the office with questions related to work. Thus, Plaintiff could not ask anyone in proximity questions related to work and Plaintiff had to only go directly to Ms. Gomez who was located in the next suite over, down the strip mall.

68. Plaintiff was physically isolated and could not verbally communicate to employees around her regarding HSD business matters. Plaintiff had to physically get up, walk outside, and walk down to the next suite every time to conduct office business, or call and hope Ms. Gomez answered, or send email and wait. No one else was treated this way.

69. October 12, 2019 – Plaintiff submitted applications for two Special Agent positions (promotions).

70. On December 3, 2019, Plaintiff was interviewed for two open agent position promotions. At Plaintiff's promotion interview on 12/3/2019, Plaintiff disclosed she was currently on FMLA and that did not know when would be taken off FMLA by opinion of medical professionals. This FML information was disclosed and it was written on the interview questionnaires completed by the interview panel.

71. On or around February 5, 2020, Plaintiff found out less qualified individual was promoted to the Special Agent position. HSD admitted in the EEOC response to position statement that the minimum qualification requirement of the agent position is a bachelor's degree. However, one of the individual's HSD hired, Christy Aragon, only has an associate level degree.

72. HSD also neglected the truth that the other individual they hired to Agent position was a previous agent that had quit OIG in August 2019. Sarina Lopez resigned from her position, received pay raise to another State agency, she didn't like the new job, so OIG hired her back which is manipulation of the hiring system.

73. On December 26, 2019, Ms. Gomez called Plaintiff into Mr. Gallegos's office. Plaintiff was given written warning reprimand that Plaintiff believes is further harassment and discrimination. Plaintiff was given written warning reprimand regarding the way she wrote emails and for not going to Plaintiff's supervisor, Ms. Gomez, first.
74. Plaintiff's email etiquette involves one of Plaintiff's disabilities where she must be extra informative, always do Plaintiff's best, and thoroughly explain things. Plaintiff was being informative in emails to go above and beyond.
75. On or around January 30, 2020, Plaintiff submitted a response Rebuttal to Written Warning to HSD.
76. HSD has exhibited Mistreatment & Discrimination regarding lack of progressive and equal Discipline.
77. When Plaintiff received the written warning reprimand on 12/26/2019, she received three consequences total. There was no progressive discipline and Plaintiff was punished with three consequences all at once. However, there was a bullying incident against Plaintiff around March 2019. Plaintiff was being bullied by two coworkers, not the first occurrence, and two other coworkers overheard and reported the bullying. However, Plaintiff's bullies were not punished as severely as Plaintiff was.
78. March 2020, OIG requested OHR give a 10% pay raise to one of Plaintiff's abusers. They request a pay increase for one of the individuals who was bullying Plaintiff.
79. March 2020, OIG stole Plaintiff's letter requesting a pay increase that was submitted on 4/8/2019, OIG edited it, and submitted letter to OHR requesting to give their favorite, Stacie Abeita, a ten percent pay increase. OIG used Plaintiff's letter, Plaintiff's verbiage, Plaintiff's information, Plaintiff's hard work, and placed Stacie Abeita's name on it to get their favorite a pay increase.
80. On January 10, 2020, Plaintiff notified Bureau Chief, Ken Romero, that Plaintiff was considering filing a grievance with OHR.
81. On January 13, 2020, Plaintiff called OHR and spoke with Lora Olson briefly. Lora recommended Plaintiff place concerns in writing.
82. On or about February 6, 2020, Plaintiff submitted Whistleblower complaint to HSD/OHR and OOS that totaled over 200 pages with supporting documentation.

83. Plaintiff filed grievances with OHR and OOS on 2/6/2020 (Whistleblower), 3/10/2020, 3/16/2020, 4/16/2020 (at least and more) but Plaintiff received no relief.
84. On May 20, 2020, OHR acting director, Judith Parks, told Plaintiff that Plaintiff would have a written report regarding HSD's investigation by June 10th, 2020 but to this day, I have not received anything.
85. On July 17, 2020, OHR acting director, Judith Parks, emailed Plaintiff stating once HSD's investigation report was complete, OHR can provide a written summary report to Plaintiff upon Plaintiff's request.
86. Of course Plaintiff was requesting a report or any response whatsoever regarding the discrimination and retaliation endured.
87. July 20, 2020 Plaintiff responded via email, "Yes, please, I want a copy of the report of investigation." To this day, HSD has failed to provide any report nor any response.
88. Plaintiff never received a report regarding any of the issues raised by the Whistleblower and other complaints filed with HSD.
89. Plaintiff was treated differently than how her coworkers were treated.
90. On May 1st, 2020, HSD supervisor Jessica Gomez subjected Plaintiff to further harassment with accusations of leaving the building and State assets unsecured. Plaintiff believes this was a set-up to get Plaintiff in trouble as Ms. Gomez knew Plaintiff was the only person in the office that day.
91. None of Plaintiff's coworkers were subjected to such harassment and mistreatment.
92. Wednesday, June 17, 2020, supervisor Gomez subjected Plaintiff to more harassment. Plaintiff received text message from supervisor, Jessica Gomez, to Plaintiff's personal cellphone after 8pm (after work hours) where Gomez stated, "Tell me please if it is okay to request employees to respond less than an hour from an email or text."
93. March 9, 2020, I was denied training by Plaintiff employer and supervisor. I have never been sent to South Carolina for training at Medicaid Integrity Institute (MII), but all of Plaintiff coworkers have; some go several times per year. The other management analyst was sent to MII for weeklong training in South Carolina at least twice last year (April & November 2019). However, I have never been sent to South Carolina for training. Everyone is sent to training in South Carolina, but not me. March 2020 was the latest a coworker was sent to South Carolina (before COVID-19). I was also denied training on

or around September 23, 2019 where Plaintiff entire unit was sent to Artesia, NM for weeklong training but not me.

94. On March 9, 2020, HSD supervisor Jessica Gomez subjected Plaintiff to harassment by sending me text messages to Plaintiff's personal cellphone saying, "you're too loud, can hear you through the walls, the walls are pretty thin, and the vents bring stuff right through." No other coworkers were subjected to such treatment. However, Plaintiff was experiencing a panic attack. No one else was in the building other than Plaintiff supervisor and Agent Stacy Schell because everyone else was eating lunch in Suite A eating lunch (Plaintiff was in Suite B).

95. On March 10, 2020, Plaintiff filed another written grievance (number two) with OHR and OOS regarding the injustices being experienced.

96. On March 16, 2020, Plaintiff filed another written grievance (number three) with OHR and OOS regarding the injustices being experienced.

97. None of Plaintiff coworkers were subjected to such treatment described in bullets above.

98. April 16, 2020, Plaintiff job duties were changed again and reduced the allotted amount of time given to complete Plaintiff assignments in Plaintiff employee evaluation (EE).

99. None of Plaintiff's coworkers were subjected to such treatment as indicated in bullet above.

100. April 16, 2020, Ms. Gomez listed in Plaintiff's employee evaluation that Plaintiff wastes everyone's time asking and discussing why office procedures change. Discussing why office procedures change, and gaining understanding, helps to alleviate one of Plaintiff's disability symptoms.

101. Plaintiff's coworkers were never subjected to such treatment as indicated in bullet above.

102. On April 16, 2020, Plaintiff filed another grievance with OHR and OOS.

103. May 18, 2020, Plaintiff was told by OHR that they needed to submit additional paperwork regarding Plaintiff's disabilities for ADA reasonable accommodation.

104. On June 9, 2020, Plaintiff submitted the paperwork completed by medical professional requesting reasonable accommodation (OHR requested I submit this paperwork).

105. Reasonable accommodations per ADA policy were never approved. However, the requested accommodations were not essential to the hired job functions and didn't pose hardship on HSD.

106. June 18, 2020, Plaintiff was told via email that ADA does not identify removal of a specific job duty as a form of reasonable accommodation. Reasonable accommodation was never provided – this is in violation of the law.

107. July 17, 2020 (teleworking due to COVID-19) Plaintiff received an email from supervisor Gomez (around 9:30am), but supervisor Gomez was out of the office on approved bereavement leave. The email stated there was going to be a conference call meeting at 10am (in half hour) between her, the Director Adrian Gallegos, and Plaintiff. At the conference call on 7/17/21 they issued me a Written Reprimand.

108. To further retaliate against Plaintiff HSD/OIG took away Plaintiff's approved Alternative Work Schedule (AWS) of 4-10s. No other coworkers were subjected to such treatment as being reprimanded by a supervisor while that supervisor was out of the office on approved bereavement leave.

109. On July 13, 2020, Plaintiff was approved Alternative Work Schedule (AWS) of 4-10s with Friday, Saturday, and Sundays off (7:30am to 6pm with half hour lunches, Monday through Thursday). The AWS was to start July 25th, 2020.

110. On July 21st Plaintiff received an email stating HSD revoked Plaintiff's Alternative Work Schedule all together. HSD retaliated and took away Plaintiff's approved Alternative Work Schedule completely.

111. As additional retaliation and punishment, HSD took away Plaintiff's approved Fitness Leave.

112. On July 28th, 2020, Plaintiff requested change to Plaintiff's Fitness Leave, but HSD never approved Plaintiff's Fitness Leave request.

113. On or around July 23, 2020 was the last time HSD provided Plaintiff with Fitness Leave.

114. No one else was treated this way. Coworkers were approved their Fitness Leave requests and AWS, but not Plaintiff.

115. July 20, 2020 HSD/OHR denied Plaintiff's reasonable accommodation request (this was the paperwork completed by medical provider that Plaintiff submitted to OHR on June 9, 2020).

116. HSD never contacted Plaintiff's medical professional when reviewing for reasonable accommodation. Plaintiff had to call her medical professional Patricia (Pat) Parish on 7/20/20 and asked Pat to contact/call Plaintiff's employer.

117. Plaintiff's medical provided called and spoke to OHR on July 21st, 2020, but still Plaintiff was denied reasonable accommodation that did not pose any hardship.
118. HSD never provided Plaintiff reasonable accommodation per ADA policy that is of no hardship to the division.
119. On July 22, 2020, OHR emailed Plaintiff saying OHR wants to have a conference call with me on 7/23/20.
120. On July 23, 2020, Plaintiff was threatened by OHR that if Plaintiff didn't call in for the conference call/video call by 2:20pm OHR would take it as Plaintiff don't want reasonable accommodation. So, Plaintiff called into the conference call (with Lora Olson and Natisha Montoya). OHR stated they do not have to change Plaintiff's duties as a reasonable accommodation. OHR said because Plaintiff signed Employee Evaluation dated 10/17/2018 (Plaintiff had to sign EE) that Plaintiff must do overpayment claims calculations. Plaintiff told OHR that Plaintiff was not in the right state of mind when signed EE and did not consider medical conditions flaring up/episodes.
121. Plaintiff showed OHR Plaintiff's EE dated 4/15/19 that stated Plaintiff doesn't have to calculate claims anymore, but OHR didn't care.
122. At video call on July 23, 2020, Plaintiff told OHR that Plaintiff was not hired for this position when given the job/application/etc., and that the other management analysts don't do what they force Plaintiff to do (Bridget Ortiz, Ashley Dickenson, Luwanda Taylor do not calculate claims). OHR stated they do not have to restructure Plaintiff's job duties per ADA reasonable accommodation. Then, OHR stated maybe Plaintiff shouldn't be doing any of Plaintiff's job duties. OHR called into question Plaintiff's mental state and that OHR didn't know if Plaintiff should even be doing Plaintiff's job that she was hired for. OHR said because of Plaintiff's disabilities, Plaintiff shouldn't be screening cases, and that Plaintiff shouldn't be doing other duties of the job (this had nothing to do with ADA reasonable accommodation request). Plaintiff told OHR screening cases is fine and that is the job Plaintiff was hired to do. However, OHR said that maybe Plaintiff shouldn't be working at OIG and that maybe it's not the place for me.
123. In the Plaintiff's opinion, OHR completely dismissed request for reasonable accommodation per ADA policy, and instead tried to turn the conversation around onto Plaintiff and what abilities/capabilities Plaintiff has.

124. HSD never approved reasonable accommodation request that didn't pose any hardship nor cost, which is in violation of ADA laws.
125. If the conference call with OHR 7/23/20 was recorded it was not to Plaintiff's knowledge. Plaintiff was never made aware the call was being recorded and Plaintiff never consented to being digitally recorded. OHR representation Natisha stated she was taking notes, Plaintiff requested a copy of those notes, but never received a copy.
126. August 28, 2020, I received an email from supervisor Jessica Gomez requesting Plaintiff input in the wording and instruction regarding Standard Operating Procedures (SOP). HSD rewrote Standard Operating Procedures (SOP) for claims that states Plaintiff's position must complete overpayment claims calculations. HSD wrote SOP to enforce this Plaintiff's compliance.
127. Inequality in assignments and duties because of discrimination – The Intake position's sole duty is to process incoming referrals by either entering into ASPEN system or sending to Max Roybal in Santa Fe for PIU. The Intake position (recently hired Luwanda) is the same pay band as Plaintiff was (pay band 60). It is unfair that this same pay band position only enters referrals, but Plaintiff was forced to do much more because of Plaintiff's knowledge and skills.
128. There is great inequality in assignment of duties among Plaintiff and the other management analysts pay band 60 at OIG. Management analyst, Bridget Ortiz, is under Eric Marquez's unit in the Albuquerque office. One day per month Bridget takes OIG's six State vehicles to the Rain Tunnel car wash on Central & Rio Bravo to be cleaned – this is one of her assigned duties. HSD would never let Plaintiff get away with taking all the cars to the car wash for cleaning.
129. There is obvious unfair treatment and assignment of duties.
130. This entire ordeal is horrible for Plaintiff who is saddened and distraught. The unjust working conditions caused unnecessary and severe psychological, mental, and emotional distress to Plaintiff. This is severely detrimental to Plaintiff medical disorder and increases Plaintiff symptoms.
131. In 2020, Plaintiff had to take antianxiety medication just to go into the HSD/OIG office to check the mail while staff were teleworking due to COVID-19.

132. HSD has been telling Plaintiff that they are investigating and will get back to Plaintiff but HSD failed to do such.
133. On May 20, 2020 Judith Parks, Acting Director of OHR, emailed Plaintiff stating that a summary report of the investigation would be sent to Plaintiff by 6/10/20. This was a lie as no report was ever provided to Plaintiff.
134. On July 17, 2020 Judith Parks emailed Plaintiff stating once the investigation report was complete, OHR can provide a written summary report to me upon my request. Of course I was requesting a report or any response whatsoever to the discrimination happening to me. Obviously, I was requesting a response from HSD.
135. On July 20, 2020 Plaintiff responded via email that, "Yes, please, I want a copy of the report of investigation." To this day, HSD has failed to provide any report nor any response regarding Plaintiff's grievances.
136. In addition, HSD has failed to provide reasonable accommodation per ADA policy based on my disabilities, despite thorough documentation provided from my medical professionals.
137. In 2020, fellow coworkers at HSD/OIG stated that they were interviewed via telephone by OHR and by Office of General Council (OGC) pertaining to HSD's investigation.
138. Plaintiff never received any report whatsoever regarding HSD's supposed investigation.
139. OHR/OOS/OGC panders to OIG with extreme negligence, fails to take any action, and allows severe Discrimination to continue.
140. HSD has sat back and allowed discrimination, harassment, reprimand, and inequality against Plaintiff.
141. On October 9, 2020, Plaintiff submitted a response of Rebuttal to Written Reprimand (RTWR) to HSD.
142. In or about November 2020, Plaintiff suffered constructive discharge and loss of employment due to HSD's negligence and violations of the laws.
143. When Plaintiff contacted HSD's Office of the Secretary regarding the workplace violations experienced, HSD Secretary David R. Scrase, M.D., informed Plaintiff he was "busy fighting COVID" to help Plaintiff himself.

144. HSD is in direct violation of employee rights, violation of HSD Code of Conduct, has cultivated and allowed a hostile work environment, and is in violation of basic civil human rights.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which retaliates against employees who complain about discrimination.

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for employees who exercise their federally protected rights to complain about discrimination and which eradicate the effects of its past unlawful employment practices.

C. Order Defendant to make whole Ms. Lucero by providing appropriate backpay with prejudgment interest, and all other affirmative and equitable relief necessary to eradicate the effects of its unlawful employment practices.

D. Order Defendant to make whole Ms. Lucero by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in this Complaint, including but not limited to, job search expenses, medical expenses, and all other applicable restitution avenues.

E. Order Defendant to make whole Ms. Lucero by providing compensation for past and future non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish and turmoil, loss of enjoyment of life, humiliation, and all additional damages.

F. Order Defendant to provide training to its officials, directors, managers and employees regarding discriminatory harassment and retaliation in the workplace.

G. Plaintiff respectfully requests that this Court hear this matter, and requests Defendant to pay all legal fees, all representation attorney fees, all other costs incurred and/or associated with this Complaint.

H. Grant such further relief as the Court deems necessary and proper in the public interest.

Respectfully Submitted,

X _Vanessa Lucero_   6/15/21

Vanessa Lucero
Pro Se

18 | Page